# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

JOHN T. DAVIS,

        Plaintiff,

  v.                                Civil Action 2:19-cv-265
                                     Judge Michael H. Watson
                                     Magistrate Judge Jolson

COMMISIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, John T. Davis, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

Plaintiff filed his applications for DIB and SSI on May 19, 2015, alleging that he was disabled beginning May 18, 2015. (Doc. 9, Tr. 251–60). After his applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on November 14, 2017. (Tr. 82–126). On May 24, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 34–56). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 28, 2019 (Doc. 1), and the Commissioner filed the administrative record on April 16, 2019 (Doc.

9).  Plaintiff filed his Statement of Errors, (Doc. 14), on June 21, 2019, Defendant filed an Opposition, (Doc. 16), and no reply was filed.  Thus, this matter is now ripe for consideration.

### A. Relevant Medical History and Hearing Testimony

Because Plaintiff's statement of errors pertains to only his left shoulder impairment and his ability to use his left upper extremity, the Undersigned will limit the discussion of the medical record and the hearing testimony to the same.

#### 1. Medical History

A November 18, 2013, x-ray of Plaintiff's left shoulder showed mild osteoarthritis of the AC joint and a small corticated ossicle at the inferior margin of the glenoid.  (Tr. 485).  A July 18, 2016, x-ray revealed degenerative changes of the AC joint.  (Tr. 836).  Plaintiff participated in physical therapy for his left shoulder between August 15, 2016, and September 13, 2016.  (Tr. 933–49).  On August 29, 2016, Dr. Aaron Roberts treated Plaintiff for shoulder pain.  (Tr. 1069). Dr. Roberts noted shoulder pain, acromioclavicular joint arthritis, left shoulder impingement, and decreased range of motion of the shoulder.  (*Id.*).  A September 1, 2016, MRI of Plaintiff's left shoulder revealed small sub-centimeter focal high grade interstitial tear of the supraspinatus tendon, mild to moderate underlying tendinopathy, mild infraspinatus and subscapularis tendinopathy, mild to moderate intra-articular long head biceps tendinopathy, multifocal labral degeneration and tearing, thickened and edematous inferior glenohumeral ligament, edema in the soft tissues of the rotator interval, possible adhesive capsulitis, and mild AC degenerative change. (Tr. 932).

On September 8, 2016, Plaintiff saw Dr. Roberts for treatment of his left shoulder.  (Tr. 1066).  Dr. Roberts noted shoulder pain, acromioclavicular joint arthritis, impingement, and decreased range of motion.  (*Id.*).  He referred Plaintiff to Dr. Brian Cohen for a surgical evaluation. (*Id.*).  On September 19, 2016, Dr. Cohen found complete tear of Plaintiff's left rotator cuff and

acromioclavicular joint arthritis. (Tr. 1063.). On September 23, 2016, Plaintiff underwent a left shoulder arthroscopy, subacromial decompression, rotator cuff repair, and distal clavicle resection. (Tr. 924). Following the surgery, he participated in physical/occupational therapy between November 4, 2016, and December 12, 2016. (Tr. 890–916).

On November 2, 2016, Plaintiff saw Dr. Cohen for a follow-up appointment. (Tr. 1057). Plaintiff reported doing well following his surgery, and Dr. Cohen noted that he was ahead of schedule in his recovery. (*Id*.). On November 29, 2016, Plaintiff was found to be making good progress following his rotator cuff surgery. (Tr. 953).

A December 30, 2016, MRI of Plaintiff's left shoulder revealed interval surgical intervention to the rotator cuff, high grade partial-thickness versus full-thickness re-tear of the distal anterior supraspinatus tendon, superimposed tendinosis versus postsurgical change to the tendon, stable mild tendinosis to the long head biceps tendon, stable degenerative tearing of the superior and anterior labrum, and stable degenerative changes to the AC joint. (Tr. 961).

On January 3, 2017, Plaintiff saw Dr. Cohen after falling down a flight of stairs and suffering a re-tear of his left shoulder rotator cuff. (Tr. 1051). Dr. Cohen documented limited active and passive range of motion and weakness of elevation. (*Id*.). On January 20, 2017, Plaintiff underwent a left shoulder arthroscopy with foreign body removal and revision of rotator cuff repair. (Tr. 1045). At a follow up appointment, on January 27, 2017, Plaintiff was doing well. (Tr. 1042). Plaintiff saw Dr. Cohen again On March 1, 2017, where he again was found to be doing well. (Tr. 1039). Plaintiff participated in physical therapy between March 6, 2017, and June 6, 2017. (Tr. 1078–1127). March 29, 2017, exam records note that Plaintiff was progressing slowly. (Tr. 1036). On May 23, 2017, Plaintiff saw Dr. Cohen, who documented persistent limited range of motion in the left shoulder, pain, and weakness. (Tr. 1030). He noted that Plaintiff had

3

made some improvement with physical therapy and would continue to advance with a home exercise program. (*Id.*).

On July 5, 2017, Dr. Cohen assessed shoulder pain. (Tr. 1128). On July 20, 2017, Plaintiff underwent a left shoulder MRI that revealed mild to moderate acromioclavicular arthropathy, improvement of subacromial bursal fluid, postsurgical lateral crucial zone degeneration and attenuation, and stable chronic superior labral tear. (Tr. 1138). On July 25, 2017, Dr. Cohen noted adhesions of the left shoulder joint. (Tr. 1228). Plaintiff reported that he was unhappy with his left shoulder post-operative progress. (*Id.*). Exam records reveal a loss of range of motion and weakness of the left shoulder. (*Id.*).

On August 2, 2017, Plaintiff underwent a third surgical procedure of his left shoulder— left shoulder arthroscopy with lysis of adhesions. (Tr. 1156). Plaintiff participated in physical therapy for his left shoulder from August 15, 2017, through September 18, 2017. (Tr. 1189–1208). On September 12, 2017, Dr. Cohen noted that Plaintiff was doing well post-surgery and had improvement in his motion and strength. (Tr. 1182). Plaintiff's treating physician, Dr. Karthika Rajan, performed a physical exam of Plaintiff on September 25, 2017, and found restricted range of motion of the left shoulder. (Tr. 1240). At a post-operative appointment on October 24, 2017, Dr. Cohen noted "much improvement" in Plaintiff's passive range of motion. (Tr. 1233).

### 2. Relevant Hearing Testimony

At the hearing, the ALJ asked Plaintiff about his left shoulder:

Q. Okay. And then tell me more about what's going on with your left shoulder.

A. I tore the rotator cuff, so I had the first surgery in September of 2016. You know, so then I got healed up and out of therapy, that's when I took that part-time job with Advanced Auto. And then in January—no—December of 2015—'16, I fell down— I was getting ready to go to work. I actually was—well, I went out the front door of my house and fell down the steps. And I caught the hand rail and when I did, I went over backwards and I ripped everything loose and tore more stuff up. So then

4

they had to do another surgery again in January. Then when I came out of the January surgery, I was in the—one of them arm braces six week with the metal in it so you can't move your shoulder at all. And then, I'm guessing, between that and falling down the steps and the second injury, I have a bunch of scar tissue and whatnot, so he had to do another surgery in August of this year to get me a little bit more motion, you know. But I can—versus what I had.

Q. Okay. And how is it now?

A. It's better than it was when he did the surgery in August. But I'm still limited on my range of motion. And as far as lifting weight, I mean I can lift waist height, but to get anything higher, it's–I mean, a jug of milk I can't lift shoulder height because I can—comfortably, that's as far as I can get my arm up.

Q. All right. So you're showing it's about even with your shoulder?

A. Yeah.

Q. Okay.

A. I got any higher and it just—I mean, it's like it hurts right in the top where they did the surgery and reattached everything in that muscle.

Q. Okay. So, it's possible to go higher, it just causes pain?

A. Yes, ma'am.

Q. Okay. Are you pretty much done with any kind of treatment for your shoulder at this point, or—

A. Yes, ma'am

Q. Okay. Are you taking pain medicine?

A. I take ibuprofen twice a day, 800 milligrams.

Q. Okay.

A. I don't like the narcotic pain meds because I have enough trouble falling asleep now, so I don't—I take a narcotic pain med, it just knocks me out even longer.

Q. Oh, okay.

A. I mean, I did take a few after the surgeries, but—just for like, maybe a week.

(Tr. 96–98).

5

### 3. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through March 31, 2021, and had not engaged in substantial gainful employment since June 5, 2015, the alleged onset date. (Tr. 39). The ALJ further determined that Plaintiff suffered from the following severe impairments: degenerative joint disease of the left shoulder, degenerative joint disease of the right knee, degenerative joint disease of the right foot, plantar fasciitis, degenerative disc disease of the lumbar spine, diabetes mellitus with peripheral neuropathy, and obesity. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 41).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can lift carry, push and pull 20 lbs. occasionally and 10 lbs. frequently using primarily the right, dominant arm with the left to assist. He can frequently handle, finger, and reach in front and laterally with the left upper extremity. He can occasionally push, pull and operate foot controls with the bilateral lower extremities. He can occasionally climb ramps and stairs, stoop, kneel and crouch. He can never crawl or climb ladders, ropes or scaffolds. He can never be exposed to hazards (such as unprotected heights and exposure to moving mechanical parts). He can never reach overhead with the left upper extremity.

(Tr. 42).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 43).

The ALJ then turned to the medical records and Plaintiff's treatment history. She began with records relating to Plaintiff's left shoulder impairment:

> The claimant received ongoing care and treatment for his shoulder impairment. On

6

> September 23, 2016, the claimant underwent surgery on his left shoulder to repair a torn rotator cuff. (Exhibit 31F). An MRI of his left shoulder performed three months following the surgery showed tendinosis, degenerative changes to his AC joint and degeneration and tearing of the superior and anterior labrum (Exhibits 21F; 26F). The claimant underwent another left arthroscopy to repair his rotator cuff in January 2017 (Exhibit 31F). Treatment notes following the repair surgery indicated that the claimant was showing signs of progress (Exhibit 31F). A recent MRI showed stable normal alignment of the shoulder with mild to moderate acromioclavicular arthropathy, stable chronic superior labral tear but no new rotator cut off tear or other abnormalities (Exhibit 34F). The medical evidence showed the claimant continued to have restricted range of motion and decreased strength in his left shoulder (Exhibit 43F; 46F). However, his physical therapist noted that his prognosis was good with continued therapy (Exhibit 24F).

(Tr. 43–44).

The ALJ also noted that that:

> [a]lthough the claimant continued to show restricted range of motion in his left shoulder and decreased strength in his left shoulder, the medical imaging showed that the claimant's shoulder impairment was in stable condition (Exhibits 24F; 34F; 43F). The claimant reported to his physical therapist that he continued to enjoy hunting and riding his motorcycle (Exhibit 24F).

(Tr. 45).

As for the relevant opinion evidence, the ALJ gave partial weight to the opinions of state agency medical consultants, Dr. McKee and Dr. Cacchillo, who opined that Plaintiff could perform light work with occasional postural limitations. (Tr. 45). The ALJ agreed that the medical evidence supports light work, but relevant here, noted that "[t]he evidence regarding claimant's history of surgeries, degenerative changes of his left shoulder and some reduced range of motion supports limitations in lifting, carrying and manipulating with his left upper extremity." (*Id*.).

The ALJ assigned little weight to Plaintiff's treating physician, Dr. Rajan, who opined on a Diabetes Mellitus Residual Functional Capacity Questionnaire, that Plaintiff could sit and stand for less than two hours in an 8-hour workday, occasionally lift 10 pounds, use his hands to turn and twist objects only 20% of the workday, stoop and crouch 10% of the workday, and avoid even

7

moderate exposure to hazards. (*Id*.). The ALJ explained:

> I considered Dr. Rajan's opinion in adding additional non-exertional limitations to the claimant's residual functional capacity. However, I afforded the specific limitations little weight because they are not supported by the longitudinal record. . . . Dr. Rajan's physical examination notes indicate that his examination was normal except for decreased range of motion in his shoulder and diminished sensation to monofilament in his feet. . . . She offers limits with respect to the right arm as well as the left, despite the la[ck] of any impairment associated with the right arm (other than some intermittent neuropathic symptoms alleged to his hands, without objective testing or support).

(Tr. 45–46).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff raises a single error to the Court, arguing that the ALJ's RFC analysis is not supported by substantial evidence. (Doc. 14 at 18–24).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Ultimately, "the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019) (citing *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544–546 (6th Cir. 2004); *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)).

Here, Plaintiff's objection is premised on his contention that the RFC requires him to "frequently use his left upper extremity." (Doc. 14 at 18). But Plaintiff omits a critical portion of the RFC. True, the ALJ found that Plaintiff can "frequently, handle, finger, and reach," but she added an important caveat—that Plaintiff should be limited to reaching only in front and laterally with the left upper extremity. (Tr. 42). Indeed, the RFC explicitly provides that Plaintiff "can never reach overhead with the left upper extremity." (*Id*.). And, upon review of the hearing testimony and medical record, the Undersigned finds that substantial evidence supports these accommodations.

To start, at the hearing, Plaintiff testified that he has limited range of motion but can lift waist height. (Tr. 97). He also testified that he cannot lift "shoulder height." (*Id*.). It was therefore

reasonable for the ALJ to limit Plaintiff to reaching in front and laterally with his left arm but never overhead. And, these are not the only limitations the ALJ put in place to accommodate Plaintiff's shoulder impairment. The RFC also provides that Plaintiff can lift carry, push, and pull 20 pounds occasionally and 10 pounds frequently "using primarily the right, dominant arm with the left to assist." (Tr. 42). These two sets of accommodations undermine the thrust of Plaintiff's argument—that the ALJ failed to accommodate his shoulder impairment.

Moreover, in weighing the opinion evidence, the ALJ afforded only partial weight to consultative opinions with which she otherwise agreed, in part because the opinions did not provide adequate accommodations for his left shoulder. In assessing the opinions of the state agency medical consultants, Dr. McKee and Dr. Cacchillo, the ALJ found:

> I agree that the medical evidence supports light work; however, the medical evidence also supports additional limitations in the claimant's residual functional capacity. The evidence regarding claimant's history of surgeries, degenerative changes of his left shoulder and some reduced range of motion supports limitations in lifting, carrying and manipulating with his left upper extremity (Exhibits 31F; 34F).

(Tr. 45). It is clear, therefore, from her opinion that the ALJ recognized Plaintiff's shoulder issues, including his multiple surgeries and his limited range of motion. And, it is equally clear that the ALJ tailored the RFC accordingly.

Additionally, when reaching her RFC finding, the ALJ reasonably relied on signs of progress and MRI results, in addition to the record as a whole, including exam and imaging results, Plaintiff's daily activities, and the hearing testimony. For example, she relied on Plaintiff's progress following his second shoulder surgery, including the relatively benign results of an MRI and the fact that his physical therapist noted a good prognosis. (Tr. 44). Plaintiff insists that the ALJ should not have relied on this evidence because of the fact that he underwent a third surgery seven months later. (*See* Doc. 14 at 19–23). But this subsequent surgery does not mean that the

ALJ erred in considering Plaintiff's post-surgery improvement. To the contrary, it is the ALJ's job to consider the "record as a whole." *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010). As such, Plaintiff's argument that his third surgery diminished the relevance of any medical evidence prior to that surgery is unpersuasive.

To the extent Plaintiff suggests that the ALJ overlooked his third surgery, the record shows otherwise. At the hearing, Plaintiff testified about his multiple surgeries and his overall progress following his surgeries:

> A. I tore the rotator cuff, so I had the first surgery in September of 2016. You know, so then I got healed up and out of therapy, that's when I took that part-time job with Advanced Auto. And then in January—no—December of 2015—'16, I fell down—I was getting ready to go to work. I actually was—well, I went out the front door of my house and fell down the steps. And I caught the hand rail and when I did, I went over backwards and I ripped everything loose and tore more stuff up. So then they had to do another surgery again in January. Then when I came out of the January surgery, I was in the—one of them arm braces six weeks with the metal in it so you can't move your shoulder at all. And then, I'm guessing, between that and falling down the steps and the second injury, I have a bunch of scar tissue and whatnot, so he had to do another surgery in August of this year to get me a little bit more motion, you know. But I can—versus what I had.
>
> Q. Okay. And how is it now?
>
> A. It's better than it was when he did the surgery in August. But I'm still limited on my range of motion. And as far as lifting weight, I mean I can lift waist height, but to get anything higher, it's–I mean, a jug of milk I can't lift shoulder height because I can—comfortably, that's as far as I can get my arm up.

(Tr. 96–97).

The above testimony establishes that the ALJ was aware of Plaintiff's third shoulder surgery and his reduced range of motion. (*See id.*; *see also* Tr. 44 (noting that medical records showed decreased range of motion and decreased strength of the left shoulder)). As discussed, the ALJ reasonably accommodated Plaintiff's reduced range of motion in the RFC by placing restrictions on Plaintiff's ability to lift.

Finally, Plaintiff asserts that the ALJ erred in discrediting his treating physician's functional limitations that he would be limited to using his left arm only 20% of the workday. (Doc. 14 at 23). Plaintiff is not making a treating physician argument, per say, but is arguing instead that the ALJ did not adequately explain her decision not to incorporate his treating physician's functional limitations into the RFC. (*See id.*). Again, Plaintiff omits an important part of the picture. Dr. Rajan treated Plaintiff's severe diabetes and assessed functional limitations as part of a Diabetes Mellitus Residual Functional Capacity Questionnaire. (Tr. 1185). Her opinion and related functional limitations are therefore relevant to Plaintiff's diabetes and corresponding ailments. (*See, e.g.*, *id.* (noting type 2 diabetes and associated symptoms, including loss of sensation)). There is no indication from the opinion that it is in any way related to Plaintiff's rotator cuff surgeries. Nor do Dr. Rajan's treatment records show that she treated Plaintiff's shoulder following these surgeries, other than noting reduced range of motion on physical exam. (*See, e.g.*, Tr. 1240). This would make sense given that Plaintiff sees Dr. Rajan at Berger Endocrinology. (*See, e.g.*, Tr. 1148). It is therefore understandable why, when discussing Dr. Rajan's opinion, she did not discuss Plaintiff's shoulder at length.

More importantly, an ALJ is "not required to incorporate the entirety of [an] opinion" into an RFC. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). For it is the ALJ, not a physician, who ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."). Indeed, "[a]n RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ." 20 C.F.R. §§ 404.1527(e), 405.1546.

Therefore, the ALJ was not required to incorporate any portion of Dr. Rajan's opinion into her RFC, and consequently, Plaintiff has shown no reversible error.

In sum, the ALJ relied on the evidence as a whole and appropriately tailored the RFC to accommodate Plaintiff's shoulder impairment. While Plaintiff may disagree with these accommodations, he has not shown that it was outside the ALJ's permissible "zone of choice" that grants the ALJ discretion to make findings without "interference by courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of

the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.


Date:   November 8, 2019                                    /s/ Kimberly A. Jolson
                                                                       KIMBERLY A. JOLSON
                                                                       UNITED STATES MAGISTRATE JUDGE